UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOSEPH HECHAVARRIA,

                              Plaintiff,

           -against-

SCORCH BAR & GRILL INC., and JAMAAI
YOUNG, individually,

                              Defendants.

**MEMORANDUM & ORDER**
**23-CV-1743 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Joseph Hechavarria brought this action against Defendants Scorch Bar & Grill Inc. and Jamaai Young (collectively, "Defendants") for alleged violations of 42 U.S.C. § 1981 ("Section 1981") and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* for subjecting Plaintiff to a hostile work environment based on Plaintiff's race on December 23, 2022, and retaliating against Plaintiff by firing him the following day. (*See generally* Compl. (Dkt. 1)) Pending before the court is Defendants' motion for summary judgment filed on August 30, 2024 pursuant to Federal Rule of Civil Procedure 56. (Mem. of Law in Supp. of Defs.' Mot. (Dkt. 25-1); Mem. of Law in Opp. to Defs.' Mot. (Dkt. 26); Reply Mem. in Supp. of Defs.' Mot. (Dkt. 27).) On September 3, 2024, the court referred the motion to Magistrate Judge Vera M. Scanlon for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (Sept. 3, 2024 Order Referring Mot.) Judge Scanlon issued the annexed R&R on February 25, 2025, recommending that the court deny Defendants' motion for summary judgement. (R&R (Dkt. 32) at 52.) Specifically, Judge Scanlon recommends that summary judgment as to Plaintiff's hostile work environment claims under Section 1981 and the NYCHRL be denied because the parties'

1

"competing narratives" concerning whether Plaintiff raised an in-ference of discrimination requires credibility determinations that must be left to the jury. (*See id.* at 33-34.) Judge Scanlon recom-mends that summary judgement as to Plaintiff's retaliation claims under Section 1981 and the NYCHRL also be denied be-cause "there are disputed material facts as to whether retaliation was a but-for cause of Defendants' decision to terminate Plain-tiff's employment." (*See id.* at 52.)

**No party has objected** to Judge Scanlon's R&R, and the **time to do so** has passed. *See* Fed. R. Civ. P. 72(b)(2). Therefore, the court reviews the R&R for clear error. *Velasquez v. Metro Fuel Oil Corp.*, 12 F. Supp. 3d 387, 397 (E.D.N.Y. 2014). Having found none, the court ADOPTS the R&R in full pursuant to 28 U.S.C. § 636(b)(1). The court DENIES Defendants' motion for summary judgment.

SO ORDERED.

Dated:      Brooklyn, New York
            August 28, 2025

                                    s/Nicholas G. Garaufis
                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOSEPH HECHAVARRIA,                         :
                                            :
                                            :
                           Plaintiff,       :     **REPORT & RECOMMENDATION**
            – against –                     :
                                            :     23 Civ. 1743 (NGG) (VMS)
SCORCH BAR & GRILL, INC.,                   :
and JAMAAI YOUNG, individually,             :
                                            :
                           Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**Vera M. Scanlon, United States Magistrate Judge:**

This is an employment action alleging discrimination and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 et seq. ("NYCHRL").  Plaintiff Joseph Hechavarria ("Plaintiff" or "Mr. Hechavarria") alleges that he was subject to a hostile work environment based on his race on December 23, 2022, and subject to retaliation when he was terminated the next day.  See generally Compl., ECF No. 1.  Before this Court is Defendants Scorch Bar & Grill's ("Scorch") and Jamaai Young's ("Mr. Young") (together, "Defendants") motion for summary judgment. For the reasons stated below, I respectfully recommend that Defendants' motion be denied.

I. **BACKGROUND**

The following facts are taken from Plaintiff's complaint at ECF No. 1, Defendants' motion for summary judgment at ECF No. 25 and the corresponding exhibits, Plaintiff's opposition at ECF No. 26 and the corresponding exhibits, and Defendants' reply brief at ECF No. 27.  Undisputed factual assertions are stated generally and primarily with citations to Plaintiff's Rule 56.1 Statement; facts in dispute are attributed only to the relevant witness or witnesses, and are noted as such.

1

### A.    Factual Background

Scorch was a restaurant and lounge based in Brooklyn, New York, that was open from approximately July 2022 to March 2023.  See Pl.'s Rule 56.1 Statement ¶¶ 2-3, ECF No. 26-1. When Scorch was open, Mr. Young was its owner.  See id. ¶ 7.  Mr. Young opened Scorch to "give back to people in the community and to help support Black people."  Id. ¶ 4.  All employees of Scorch, including Mr. Young, were African American.  See id. ¶¶ 6-7.

Plaintiff, an African American man, started working as a helper to the main cook at Scorch in or around August 2022.  See id. ¶¶ 6, 12.  Shortly after Plaintiff's hire, Plaintiff became Scorch's only cook.  See id. ¶ 12.  While employed at Scorch, Plaintiff reported to Terry Moore ("Mr. Moore"), a Scorch manager. See id.  ¶¶ 9, 13.  Both Mr. Moore and Mr. Young had the authority to hire and fire Plaintiff.  See id. ¶¶ 8, 10.  Plaintiff's starting pay rate was $18.00 per hour.  See Young Dep. 19:18-25, ECF No. 26-8.  "Sometime around December 2022," Plaintiff's hourly wage was increased to $19.00 per hour.  Id. 20:5-10.  Mr. Young testified that he gave Plaintiff the raise because Plaintiff had asked for more money, due to personal struggles with which Plaintiff was dealing at the time.  See id. 20:8-21:11.

Plaintiff testified that he and Mr. Young had a relationship that was sometimes contentious, sometimes cordial.  See Pl.'s Rule 56.1 Statement ¶ 21.  Plaintiff also testified that sometimes Mr. Young would act "like a mentor" to him.  Hechavarria Dep. 28:14-15, ECF No. 26-7.  He testified that other times, Mr. Young was "just evil" and only "cared about the numbers that [were] produced for him."[1]  Id. 28:15-19.

---

[1] Plaintiff testified that Mr. Young created a hostile work environment when he "didn't hit his sales quotas, he would come and give us a stern speech and take it out on us[.]"  Hechavarria Dep. 259:10-20.  Plaintiff does not connect these incidents to any racial bias.  Earlier in his deposition, Plaintiff testified that the December 23, 2022, incident was the only instance during

2

Plaintiff testified that, in general, the work environment at Scorch was "fun" and "didn't stress [him] out." Id. 258:18-23. According to Plaintiff, the work environment became hostile on December 23, 2022, when Mr. Young subjected Plaintiff to aggressive behavior and racial epithets while at work. See Compl. ¶¶ 13-20.

### 1.    Scorch's Financial Situation

The parties do not dispute that Scorch was beset with financial troubles soon after Scorch opened, which lasted throughout the restaurant's lifetime.[2] See Pl.'s Rule 56.1 Statement ¶ 86.

The parties also agree that Mr. Young continuously looked for ways to increase revenue for Scorch. For example, Mr. Young tried to offer Scorch's menu on delivery platforms such as DoorDash and UberEats. See id. ¶ 89. Mr. Young saw these platforms as crucial to Scorch's success and survival; in a text message sent on September 19, 2022, Mr. Young told Plaintiff, "If we don't get on Uber this week It [sic] won't be looking good for Scorch." Defs.' Ex. S, ECF No. 25-22; see Pl.'s Rule 56.1 Statement ¶ 89.

According to Messrs. Young and Moore, Mr. Young also looked for ways to reduce expenses at Scorch. See Moore Dep. 42:21-24, 44:7-20, ECF No. 25-6; Young Dep. 47:16-48:17. For example, Mr. Young discussed closing Scorch on Sundays, reducing employees' hours, and eliminating job positions. See Pl.'s Rule 56.1 Statement ¶ 90.

Mr. Young shared these financial concerns with his employees, including Plaintiff, on several occasions. See id. ¶ 91. For example, on December 8, 2022, Mr. Young sent a text message to Plaintiff, saying, "[w]e are in [a] deficit." Id.; see Defs.' Ex. W, ECF No. 26-26. On

---

which someone made a comment based on Plaintiff's race that could constitute a hostile work environment claim. See Pl.'s Rule 56.1 Statement ¶ 73; Hechavarria Dep. 174:14-175:2.

[2] Elsewhere in the record, however, Plaintiff testified that he did not know that Scorch was having financial troubles until December 23, 2022. See Hechavarria Dep. 183:3-6.

December 15, 2022, Mr. Young sent Plaintiff a text message with an image of Scorch's monthly budget, showing a negative balance of $9,823.00. <u>See</u> Defs.' Ex. V, ECF No. 25-25.

### 2.    Plaintiff's Performance At Scorch

The parties agree that Plaintiff was a good cook during his employment at Scorch. <u>See</u> Pl.'s Rule 56.1 Statement ¶ 14. This is where the agreement as to Plaintiff's performance ends.

Defendants contend that Plaintiff was "bad at following directions," "poor with his time and attendance," "poor with communication," and "always aggressive." Young Dep. 34:17-35:4; <u>see</u> Moore Dep. 23:23-24:2. Defendants also aver that Plaintiff did not follow the dress code, although he began to wear appropriate attire after Mr. Young told him to do so. <u>See</u> Moore Dep. 24:20-25:2; Young Dep. 64:7-65:15; Defs.' Ex. F, ECF No. 25-9. According to Defendants, Plaintiff would ask customers to give him food and drinks, and at one point, Plaintiff pursued a female patron while at work. <u>See</u> Moore Dep. 29:10-22. Plaintiff also would smoke marijuana at work, despite being told not to do so. <u>See id.</u> 25:20-26:8. Mr. Young testified that when Plaintiff received orders, "he would become aggressive and tell you he knows his rights and you can't do this and can't do that." Young Dep. 34:19-22. In general, Plaintiff denies these allegations and claims that Scorch had neither a dress code nor a prohibition on smoking marijuana at work. <u>See</u> Pl.'s Rule 56.1 Statement ¶ 14.

Defendants' most significant issue regarding Plaintiff's performance involved Plaintiff's interactions with co-workers. According to Defendants, Plaintiff got into an "aggressive" argument with a co-worker over the preparation of a menu item. <u>See</u> Young Dep. 40:9-15. Following this incident, this co-worker told Mr. Moore that Plaintiff's employment should be terminated. <u>See</u> Moore Dep. 35:13-36:3. Plaintiff denies that this incident occurred. <u>See</u> Hechavarria Decl. ¶ 9, ECF No. 26-10.

4

In a separate incident, on December 4, 2022, Plaintiff got into a physical altercation with Kwasi Fortson ("Mr. Fortson"), a dishwasher at Scorch, because a dish had not been washed correctly.  See Moore Dep. 60:1-8; Young Dep. 114:2-16; Hechavarria Dep. 53:21-54:9. Plaintiff concedes that the altercation "happened to be physical," but Plaintiff testified that he was not the aggressor.  Hechavarria Dep. 55:13-56:20.  According to Mr. Young, Plaintiff was the aggressor in this altercation.  See Young Dep. 114: 2-9.

### 3.    Defendants' Attempts To Terminate Plaintiff's Employment

Defendants offer evidence that Mr. Moore and Mr. Young together discussed terminating Plaintiff's employment on several occasions prior to December 23, 2022.  Mr. Young also discussed terminating Plaintiff's employment with Robert Golightly, a friend of Mr. Young who occasionally helped out at Scorch.  See Pl.'s Rule 56.1 Statement ¶ 18; Golightly Aff. ¶¶ 2-3, 6, 11, 14, ECF No. 25-13.

Mr. Young testified that he first discussed letting Plaintiff go with him one week into Plaintiff's employment, after Plaintiff got into a loud argument with a co-worker.  See Young Dep. 40:3-10.  Mr. Young testified that after the argument, he pulled Plaintiff over and said, "I don't think this is going to work."  Id. 40:15-17.  It is undisputed that Plaintiff asked Mr. Young to "try to make it work" because Plaintiff was a military veteran and suffered from post-traumatic stress disorder.  Id. 40:17-25; see Pl.'s Rule 56.1 Statement ¶ 16.  Mr. Young decided not to terminate Plaintiff at that point, and instead gave him another chance.  See Pl.'s Rule 56.1 Statement ¶ 16.

Plaintiff disputes that certain discussions occurred.  See Hechavarria Decl. ¶ 10. Plaintiff concedes that Mr. Young had previously discussed terminating Plaintiff's employment with him,

one week after Plaintiff started working at Scorch.  See Young Dep. 40:3-25; Pl.'s Rule 56.1 Statement ¶ 16.

The parties agree that in October 2022, Mr. Young and Mr. Moore discussed a "30 day plan" to save money at Scorch, which included reducing Scorch's menu and terminating Plaintiff's employment.  Pl.'s Rule 56.1 Statement ¶ 91; Defs.' Ex. H, ECF No. 25-11.  Mr. Young testified that Scorch would have saved money if Plaintiff's employment had been terminated, because Scorch could have "scale[d] down the menu to have smaller things," so that Mr. Moore or Mr. Young could have prepared food instead of Plaintiff.  Young Dep. 51:2-5. Mr. Young wanted to get rid of Scorch's kitchen altogether, but he kept the kitchen open on the advice of Scorch's liquor-license attorney, so the club could continue to serve alcohol.  See Pl.'s Rule 56.1 Statement ¶ 88; Young Dep. 21-24.

On October 27, 2022, Mr. Young memorialized this plan in a series of text messages sent to Mr. Moore, saying Scorch's "30 day plan" was to "[s]cale down menu" and [f]ire Joseph." Defs.' Ex. H.  That same day, Mr. Young sent another text message to Mr. Moore, saying that Plaintiff was rolling marijuana cigarettes and that Defendants could "fire him tonight[.]"  Id.

These conversations about firing Plaintiff did not result in his employment termination. For most of Plaintiff's employment, when Mr. Moore or Mr. Young would encounter problems with Plaintiff's performance, Mr. Moore testified that he would advise against terminating Plaintiff on the belief that his performance would improve.  See Moore Dep. 38:9-18, 62:21-24; Pl.'s Rule 56.1 Statement ¶ 19.

According to Defendants, Messrs. Moore and Young changed their minds as to Plaintiff's employment after the December 4, 2022, altercation between Plaintiff and Mr. Fortson.  Mr. Moore testified that, after reviewing the surveillance video of the December 4, 2022, incident, he

believed that Plaintiff's employment at Scorch needed to end because Plaintiff "had gone too far." Moore Dep. 62:21-25. Mr. Moore further testified that, "I felt that if we did not terminate him, that it would lead to something that would be a lot worse." Id. 63:3-5. Mr. Young agreed that Plaintiff should be terminated following the December 4, 2022, incident, testifying that the fight between Plaintiff and Mr. Fortson was the "straw that kind of broke the [camel's] back," which convinced him to terminate Plaintiff. Young Dep. 111:22-112:8.

Mr. Young also testified that Mr. Fortson was not terminated following the December 4, 2022, altercation, because he believed, based on the surveillance video, that Plaintiff was the aggressor in the altercation. See id. 113:12-21. In addition, Mr. Young and Mr. Moore both testified that Mr. Fortson's conduct over the course of his employment was better than Plaintiff's conduct. See id. 113:8-13; Moore Dep. 63:1-17.

According to Mr. Moore, following the December 4, 2022 incident, he typed up a termination letter addressed to Plaintiff, dated December 8, 2022, saying, "Attention: Joseph Hechavarria, Effective immediately, due to the incident that occurred on 12/04/2022 your services are no longer needed." Defs.' Ex. K, ECF No. 25-14; Moore Dep. 58:25-59:10. Mr. Moore testified that he physically handed the termination letter to Plaintiff at Scorch. See Moore Dep. 59:11-25. Plaintiff denies ever receiving the letter. See Hechavarria Dep. 65:14-21.[3]

Mr. Young testified that after the December 4, 2022, incident, Plaintiff approached him and said, "Boss, how you terminating me?" Young Dep. 107:12-16. Based on this conversation, Mr. Young inferred that Plaintiff had received the termination letter. See id. 107:15-16. Mr.

---

[3] Plaintiff testified that Mr. Moore could not have given him the termination letter because Mr. Moore had already been fired at that point. See Hechavarria Dep. 65:15-18. Plaintiff does not dispute Mr. Young's testimony that Mr. Moore was fired "toward the end of December 2022 for budget reasons." Pl.'s Rule 56.1 Statement ¶ 94. The record does not reconcile Plaintiff's inconsistent testimony on this issue.

Young testified that Plaintiff then told him that he needed money, due to issues with Plaintiff's personal life.  See id. 107:3-7.  After hearing Plaintiff's concerns about money, Mr. Young testified that he decided to extend the date of Plaintiff's termination, to "give him some more time to get his act together."  Young Dep. 114:22-115:7; see Moore Dep. 65:20-24.  After this conversation with Plaintiff, Mr. Moore testified that Mr. Young adjusted the termination letter to say, "[t]wo weeks [sic] notice given.  Effective date 12/24/2022. J.Y."[4]  Defs.' Ex. K; see Moore Dep. 66:4-13.

Plaintiff denies that he was fired on December 8, 2022.  See Hechavarria Dep. 65:19-67:10, 154:22.  Nevertheless, Plaintiff does not dispute that Mr. Young "agreed to extend Plaintiff's employment for approximately two weeks, until December 24, 2022."  Pl.'s Rule 56.1 Statement ¶ 30.  The record does not reconcile these conflicting statements.

It is undisputed that Plaintiff was still employed at Scorch on December 23, 2022.  See id. ¶ 34.  Mr. Young testified that Plaintiff's last shift would have started on December 23, 2022, and ended early morning of December 24, 2022.  See Young Dep. 118:10-119:16.  On the morning of December 23, 2022, Mr. Young sent Plaintiff a text message telling Plaintiff to come to work at 4:00 PM and saying, "[y]ou did good yesterday," without any mention that this shift would be Plaintiff's last shift at Scorch.  Pl.'s Ex. 2, ECF No. 26-4.

### 4.    The December 23, 2022, Altercation

On December 23, 2022, Plaintiff reported to work at Scorch at 4:00 PM.  See Pl.'s Rule 56.1 Statement ¶ 35.  Plaintiff testified that he arrived right when Scorch had opened for business

---

[4] Mr. Young testified that the two-week extension of Plaintiff's employment began "on or about" December 8, 2022.  Young Dep. 115:4-18.  When informed that 14 days from December 8 was December 22 and not December 24, Mr. Young testified, "[i]t could be that I maybe extended it on a Friday.  I don't remember the exact date that I signed it, so it could be that I just gave two weeks to that time."  Id. 116:17-25.

that day.  See Hechavarria Dep. 117:24-118:22.  The parties dispute whether Plaintiff had enough time to prepare the food orders that day, or whether Plaintiff was informed of the proper quantity of food to prepare.  See Pl.'s Rule 56.1 Statement ¶¶ 36, 38; Young Dep. 67:15-70:24; Hechavarria Dep. 118:12-119:5.

The parties dispute the events leading up to the December 23, 2022, altercation.  Plaintiff testified that for the first four hours of Plaintiff's shift, he had no issues with timely preparing food.  See Hechavarria Dep. 145:4-11.  At around 10:00 PM, Plaintiff testified that Mr. Young approached him in the kitchen to tell him that customers were complaining about delays in the completion of food orders.  See id. 127:3-21, 143:19-21.  Plaintiff also testified that about an hour later, at 11:00 PM, Mr. Young again asked Plaintiff about the delays in food preparation, as customers were asking for refunds on their orders.  See id. 109:4-110:7, 128:21-129:2.  According to Plaintiff, another Scorch employee informed Mr. Young that she had already spoken with Plaintiff about the timing of the cooking.  See id. 110:5-18.

Mr. Young testified that at 4:00 PM on December 23, 2022, he had a "huddle" with the staff at Scorch that there may be a delay in the preparation of food orders that day.  See Young Dep. 70:25-71:9.[5]  Mr. Young then testified that he left Scorch at that point and came back at around 7:00 or 8:00 PM.  See id. 77:10-18.  Mr. Young also testified that he did not know whether Plaintiff's timeline of the events was accurate.  See id. 74:17-22.  Nevertheless, the parties agree that at some point in the evening, Mr. Young went into the kitchen to inform Plaintiff that customers had complained about the delays in food orders.  See Pl.'s Rule 56.1 Statement ¶ 41.

---

[5] Mr. Young testified that he had this huddle because food orders were already delayed at that point.  See Young Dep. 70:15-71:3.  This testimony conflicts Plaintiff's assertion that Scorch opened at 4:00 PM that day.  See Hechavarria Dep. 117:24-118:22.

The parties dispute what happened once Mr. Young entered the kitchen.  According to Plaintiff, Mr. Young slammed his drink down "right in front of [Plaintiff] in the kitchen." Hechavarria Dep. 77:2-3.  Mr. Young was "inebriated" at that point.  Id. 109:7-8.  Mr. Young also "got all belligerent," "got in [Plaintiff's] face," and "attacked" and "threatened" Plaintiff. Id. 77:10-13, 110:19-23, 128:24-25.  Mr. Young also "chest bumped" Plaintiff.  Id. 110:24-111:4, 155:9.  Throughout this interaction, Mr. Young called Plaintiff a "hood booger," a "slave," and a "n****r."  Id. 110:19-23.  Plaintiff "let" Mr. Young chest bump him, grab him and call him "the names."  Id. 111:10-11.  Plaintiff also testified that spit flew "out of [Mr. Young's] mouth, on my face" during this incident.  Id. 155:9-11.

According to Defendants, Plaintiff, not Mr. Young, became physically aggressive.  See Young Dep. 79:9-17, 91:7-23.  Mr. Young denies aggressively touching Plaintiff or threatening to fight him.  See id. 79:15-25.  Mr. Young also denies calling Plaintiff a "hood booger" and saying that Plaintiff did not have any human rights.  See id. 84:19-85:5.  In fact, Mr. Young testified that Plaintiff "called [Mr. Young] certain words, he also was aggressive," and "he also pushed [Mr. Young.]"  Id. 122:12-16.

The parties agree that Mr. Golightly, who was present at Scorch that evening, intervened to diffuse the situation.  See Golightly Aff. ¶ 19; Hechavarria Dep. 149:24-150:7.  Whether Mr. Golightly's intervention was physical is unclear on the record; Plaintiff testified that Mr. Golightly physically interposed himself between Plaintiff and Mr. Young; Mr. Golightly stated that he "got in between" Plaintiff and Mr. Young "to separate them."  Golightly Aff. ¶ 19; see Hechavarria Dep. 111:11-13.  Mr. Golightly told Plaintiff and Mr. Young to continue their conversation downstairs, as customers could hear them arguing.  See Golightly Aff. ¶ 24; Pl.'s Rule 56.1 Statement ¶ 48.  Mr. Golightly also advised Plaintiff to collect his belongings and

leave Scorch.  See Golightly Aff. ¶ 24; Pl.'s Rule 56.1 Statement ¶ 49.  Plaintiff took Mr.

Golightly's advice and went to the basement to gather his belongings.  See Pl.'s Rule 56.1

Statement ¶ 50.

The parties again dispute what happened after Plaintiff went down into the basement.

According to Plaintiff, Mr. Young followed Plaintiff down the stairs, calling Plaintiff a "n****r"

and a "slave," and saying that Plaintiff "had no human rights."  Hechavarria Dep. 111:14-17.  In

response, Plaintiff testified that he said, "there's a building in Manhattan, Division of Human

Rights," and "I bet you won't say that again."  Id. 111:19-21.  According to Plaintiff, Mr. Young

replied, "I don't give a f**k."  Id. 111:21-22.

Defendants acknowledge that the verbal argument continued in the basement, but they

disagree with Plaintiff about Mr. Young's conduct.  See Young Dep. 84:3-85:7.  Mr. Young

testified that he did not remember whether he followed Plaintiff down the stairs, or whether

Plaintiff followed him.  See id. 82:18-23.  Mr. Young also denied further calling Plaintiff a

"hood booger" or a "slave with no human rights."  Id. 84:19-85:7, 87:18-25.

What happened next is not in dispute.  Plaintiff refused to leave Scorch, saying that he

"knew his rights."  Young Dep. 85:11-22; Golightly Aff. ¶ 26; Pl.'s Rule 56.1 Statement ¶ 54.

Plaintiff took out his cell phone and began recording the altercation between himself and Mr.

Young.  Hechavarria Dep. 153:2-7; Young Dep. 85:20-86:3.  On the video recording, Plaintiff

said, "say that again," and Mr. Young said, "F**k your human rights. You're incompetent.

You're a b***h-a** n****."  Pl.'s Ex. 1, ECF No. 26-3.  Mr. Golightly was present and heard

this exchange.  See Golightly Aff. ¶ 27.

The parties hotly contest the nature of Mr. Young's language, both in this video and

throughout this altercation.  See Pl.'s Rule 56.1 Statement ¶ 53; Defs.' Rule 56.1 Statement ¶ 53,

ECF No. 25-2.  Defendants claim that Mr. Young called Plaintiff a "n\*\*\*a."  <u>See</u> <u>id.</u>  According to Plaintiff, however, Mr. Young "didn't even say n\*\*\*a, he said n\*\*\*\*r with the E-R." Hechavarria Dep. 157:19-20.

According to Plaintiff, Mr. Golightly physically intervened again.  <u>See</u> Hechavarria Dep. 112:2-3.  The parties agree that Mr. Golightly asked Plaintiff to leave Scorch.  <u>See</u> Pl.'s Rule 56.1 Statement ¶ 56; Hechavarria Dep. 180:22-181:8.  Plaintiff followed Mr. Golightly's advice and went home.  <u>See</u> <u>id.</u> ¶ 57.  Plaintiff left Scorch around 11:00 PM.  <u>See</u> Hechavarria Dep. 112:19, 113:4-7.

The parties dispute whether Plaintiff was told to come back to work the next day.  <u>See</u> Hechavarria Dep. 153:22-154:3; Young Dep. 80:18-19.  Plaintiff testified that Mr. Young and Mr. Golightly said "just said come back tomorrow."  Hechavarria Dep. 153:23-25; 181:6-7.  He also testified that Mr. Golightly specifically said, "go home, you all two talk about this tomorrow," and "just come back to [sic] tomorrow."  <u>Id.</u> 181:2-8.  Mr. Young, on the other hand, testified that he did not "know who advised [Plaintiff] to come back the next day[,]" and he did not remember whether Mr. Golightly told Plaintiff to "leave and then comeback the next day[.]" Young Dep. 80:18-19, 83:5-8.  Mr. Golightly declared in his affidavit that he told Plaintiff "that he should reach out to Mr. Young to have a conversation in the morning once he calmed down." <u>See</u> Golightly Aff. ¶ 29.

The parties agree that food orders at Scorch that day were severely delayed.  For example, while chicken wings would normally be prepared in 15 minutes, but it took "approximately"163 minutes to cook these dishes on December 23, 2022.  Pl.'s Rule 56.1 Statement ¶ 37.  As a result of the delays, Mr. Young had to refund around $1,000 to customers that day.  <u>See</u> <u>id.</u> ¶ 58.

12

### 5.    The Aftermath And Plaintiff's Accusations Of Discrimination

Plaintiff testified that he arrived at his home at around 12:30 AM on December 24, 2022.

See Hechavarria Dep. 113:4-7.  Upon arriving home, at around 1:00 AM on December 24, 2022,

Plaintiff posted to Instagram his video recording of the altercation with Mr. Young, with the

caption, "This is how my boss is treating me."  Id. 69:13-17, 113:4-9.  Plaintiff then posted

another video to Instagram, with the caption, "This is what he does, he kicks his wife out of the

club to be with girls all night."  Id. 113:9-12.  Plaintiff posted a third video to Instagram that day

with the caption, "He mad I post the truth he only cares about image and the b***hes he f**king

every thurs to sun (sic)."  Pl.'s Rule 56.1 Statement ¶ 62; Defs.' Ex. N, ECF No. 25-17.

The next morning, on December 24, 2022, Mr. Young called Plaintiff.  See Young Dep.

98:2-18; Hechavarria Dep. 65:24-25.[6]  Mr. Young testified that he could not remember

specifically what was said during this phone call.  See Young Dep. 98:19:23.  Plaintiff testified

that Mr. Young asked him to take down the Instagram video describing his relations with other

women, because "[Plaintiff was] getting [Mr. Young] in trouble with his wife at home."

Hechavarria Dep. 65:24-66:3.  Plaintiff also testified that Mr. Young "did not care" about the

video captioned "this is how my boss is treating me."  Id. 113:7-19.

---

[6] Plaintiff offers conflicting testimony about the sequence of conversation during the texts and telephone calls with Mr. Young.  Plaintiff testified that he sent Mr. Young a text message at around 8:00 AM on December 24, 2022, and that Mr. Young called him immediately afterwards, to tell Plaintiff that Mr. Young was "thinking about closing the kitchen due to budget cuts." Hechavarria Dep. 159:18-160:4.  The only text messages sent from Plaintiff to Mr. Young on that day that were produced, however, asked Mr. Young how he could "violate [Plaintiff] then close the kitchen," which suggests that some conversation about Scorch's kitchen closing had already taken place.  See Defs.' Ex. O, ECF No. 25-18.

Plaintiff also testified that he called Mr. Young on December 24, 2022, and Mr. Young called Plaintiff back on December 29, 2022.  See Hechavarria Dep. 147:21-23, 161:6-162:4.  Yet, Plaintiff also acknowledged that he and Mr. Young spoke on the phone "throughout the day" on December 24, 2022.  See Pl.'s Rule 56.1 Statement ¶ 64.

Both parties agree that during this telephone call, they discussed the events of December 23, 2022. Mr. Young testified that "we was going over [the December 23, 2022, incident] and we was kind of saying it's not a fit now. Maybe if we – because we already planned to close." Young Dep. 99:5-12. Plaintiff testified that in this conversation, Mr. Young told Plaintiff he was closing the kitchen. See Hechavarria Dep. 113:20-21. Plaintiff also testified that in response, he told Mr. Young that Plaintiff would be out of a job if the kitchen closed. See id. 113:22-24.

Plaintiff also testified that he mentioned the New York State Division of Human Rights to Mr. Young during these telephone calls, but the record is unclear as to the timeline of Plaintiff's remarks. At one point, Plaintiff testified that "[h]e called me and told me to take down the video because I'm getting him in trouble with his wife at home. And when I said I was going to report it to the [Division] of Human Rights, that's when everything went awry." Id. 65:25-66:6. Later in his deposition, Plaintiff testified that he did not mention the Division of Human Rights until after Mr. Young mentioned closing the kitchen. See id. 113:20-114:2. Specifically, Plaintiff testified:

> [Mr. Young] goes and tells me that, well, due to budget cuts, that he's closing the kitchen. So I tell him, so technically that means I'm fired then. If you're cutting the budget, that's wrongful termination. You know what I'm saying? So I told him over the phone that I'm reporting him to the [Division] of Human Rights when I got [sic] the number from Manhattan.

Id. Th record does not reconcile this conflicting and ambiguous testimony, as Messrs. Moore and Young do not mention the Division of Human Rights in either of their deposition testimonies. See generally Young Dep.; Moore Dep.

On December 24, 2022, at 8:35 AM, Plaintiff sent Mr. Young a text message, saying, "How u violate me then close the kitchen which is basically firing me[.] I'm not a looser [sic] and you can't do that to a worker[.] Hurd [sic] u tho bossman[.] Like you said f my human

14

rights[.]"  Defs.' Ex. O.  Plaintiff testified that he felt like he was fired on December 24, 2022. See Hechavarria Dep. 162:23-163:11.[7]

Notwithstanding Plaintiff's earlier testimony that he had been fired, on December 28, 2022, Plaintiff sent Mr. Young a text message, asking if Plaintiff was "getting paid tomorrow and working[.]"  Defs.' Ex. P, ECF No.25-19.  Mr. Young responded, "Of course sir.[8]  Not working[.]  Unfortunately, I have to let you go at this point[.]"  Id.  The next day, Plaintiff sent Mr. Young a text message saying, "I was told I shouldn't be fired it's considered wrongful termination[.]"  Defs.' Ex. Q, ECF No. 25-20.  Mr. Young responded, saying, "I encourage you to seek legal advice as needed; however, New York is generally considered an 'employment at will' state."  Id.

With the apparent exception of New Year's Eve, when Scorch was open to host festivities, Scorch wound down its business very soon after Plaintiff's termination.  See Hechavarria Dep. 172:12-15.  Plaintiff spoke with Mr. Fortson after his termination, and he learned that Mr. Young was "closing down because he's losing money," and that Mr. Fortson had been let go around one week after Plaintiff's last day at Scorch.  See id. 171:9-172:2.  Mr. Moore also "was released at the end of December for budget reasons."  Young Dep. 108:10-11; Pl.'s Rule 56.1 Statement ¶ 94.  Mr. Young testified that he had to terminate "pretty much the whole entire staff because [Scorch] could not keep financially afloat."  Young Dep. 141:8-10. Mr. Young also testified that Scorch's kitchen closed after Plaintiff was fired, although it re-opened in January 2023.  See id. 96:22-97:7; Pl.'s Rule 56.1 Statement ¶ 33.

---

[7] Plaintiff also testified elsewhere in his deposition that he "got told through a text message that [he was] being let go due to budget cuts."  Hechavarria Dep. 42:5-6; see Defs.' Ex. Q.  The record is unclear as to the sequence of texts and calls.

[8] Mr. Young testified that the text message saying "Of course sir" was a typographic error, and that he had meant to tell Plaintiff, "of course not."  See Young Dep. 100:19-24.

Scorch closed its doors for good in May 2023, without any plans to re-open the business. See Pl.'s Rule 56.1 Statement ¶ 97.

### B. Procedural History

Plaintiff filed this action on March 7, 2023.  See ECF No. 1.  This Court set a discovery schedule after an initial conference, see ECF Entry dated 8/16/2023, and the parties completed discovery, see ECF No. 18; ECF Entry dated 4/29/2024.  Defendants filed a pre-motion conference letter asking to file a motion for summary judgment.  See ECF No. 23.  This Court held a pre-motion conference and set a briefing schedule for Defendants' motion.  See ECF Entry dated 6/24/2024.  The parties filed a fully briefed motion for summary judgment.  See ECF Nos. 25; 26; 27.  Pursuant to 28 U.S.C. § 636(b)(1)(B), the District Judge referred Defendants' motion to the undersigned for a report & recommendation.

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility" of identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation & quotation marks omitted) (emphasis in original).  "While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out."  Monahan v.

16

New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000) (citations & quotation marks omitted).

The Second Circuit is "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). The court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in [the non-moving party's] favor." Williams v. New York City Housing Auth., 61 F.4th 55, 68 (2d Cir. 2023). Even so, in order to withstand a motion for summary judgment, the non-moving party must present more than a "scintilla of evidence in support of the [non-moving party's] position[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (noting that "there must be evidence on which the jury could reasonably find for the plaintiff").

In deciding a motion for summary judgment, a court may not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." Barrows v. Brinker Rest. Corp., 36 F.4th 45, 54 (2d Cir. 2022) (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)). Resolving "ambiguous acts" is a task for a jury, not the court. Redd v. New York Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (citations & quotation marks omitted). "Issues of causation, intent, and motivation are questions of fact." Id. at 178. Summary judgment is therefore inappropriate when "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility[.]" Id. (quoting Fed. R. Civ. P. 56 Advisory Committee Note to the 1963 Amendment).

A court may grant summary judgment, however, "in the rare circumstance where the [non-moving party] relies almost exclusively on his own testimony, much of which is contradictory and incomplete[.]" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005)

("Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.").  "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]"  Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) (internal citations & quotation marks omitted).  Even if "opposing parties assert competing versions of the same event," such factual disputes become material "only where the conflicting testimony, if credited, would lead to a different legal outcome." Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009).

## III.  DISCUSSION

As a preliminary matter, this Court notes that the complaint in this action initially describes his claims as race discrimination and retaliation claims.  See Compl. ¶ 1.  In subsequent filings, Plaintiff clarified that his race discrimination claim is based on an allegedly hostile work environment.  See ECF Nos. 19 at 1; 24 at 2.  The parties' motion papers also categorize Plaintiff's race discrimination claim specifically as a hostile work environment claim. See ECF Nos. 25; 26; 27.  This Court will review Plaintiff's race discrimination claim under the governing law for a hostile work environment.

This Court will first review Plaintiff's hostile work environment claim, followed by his retaliation claim.

### A.    Plaintiff's Hostile Work Environment Claims

Defendants argue that Plaintiff's hostile work environment claims fail under Section 1981 and the NYCHRL because 1) the claims are based on one isolated incident of allegedly improper conduct; and 2) Plaintiff failed to show that Defendants' conduct was because of Plaintiff's race.  See Defs.' Mot. Summ. J. 5-11, ECF No. 25-1.  Plaintiff argues that Mr.

18

Young's outburst towards Plaintiff on December 23, 2022, was both sufficiently severe to constitute a hostile work environment, and was done to "dehumanize, debase and marginalize Plaintiff" because of his race.  Pl.'s Opp. Mot. 8, ECF No. 26.

This Court will review Plaintiff's hostile work environment claim first under Section 1981, then under the NYCHRL.  For the reasons stated below, this Court respectfully recommends that summary judgment as to Plaintiff's hostile work environment claims be denied.

### 1.    Legal Standard

Both Section 1981 and the NYCHRL prohibit discrimination based on race.  Section 1981 guarantees "[a]ll persons within the jurisdiction of the United States," regardless of race, the right "to make and enforce contracts" and "to the full and equal benefit of all laws and proceedings for the security of persons and property[.]"  42 U.S.C. § 1981(a).  Under the NYCHRL, it is an "unlawful discriminatory practice" to "discriminate against such person in compensation or in terms, conditions or privileges of employment" based on "actual or perceived" race.  N.Y.C. Admin. Code § 8-107(1)(a)(3).

This Court will consider Plaintiff's hostile work environment claims first under of Section 1981, then under the NYCHRL.

### a.    Section 1981

In the Second Circuit, Section 1981 "has been interpreted to 'provide a cause of action for race-based employment discrimination based on a hostile work environment.'"  Littlejohn v. City of New York, 795 F.3d 297, 320 (2d Cir. 2015) (internal brackets omitted) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000)).  This is because "an at-will employment agreement governed by New York law constitutes a contract within the meaning of 42 U.S.C. § 1981."  Whidbee, 223 F.3d at 68.  In the employment context, "[c]laims

19

of racial discrimination under § 1981 are analyzed under the same standards used for claims of discrimination under Title VII of the Civil Rights Act of 1964 ('Title VII'), 42 U.S.C. § 2000e et seq." Love v. Premier Utility Servs., LLC, 186 F. Supp. 3d 248, 251 (E.D.N.Y. 2016); see Banks v. General Motors, LLC, 81 F.4th 242, 261-62 (2d Cir. 2023).

Although discrimination claims under Section 1981 share many of the same elements of discrimination claims under Title VII, the two statutes are not identical. Unlike with Title VII, Section 1981 allows liability against individual defendants for hostile work environment claims. See, e.g., Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 455 (E.D.N.Y. 2011). Generally, in order to show individual liability under Section 1981, a plaintiff must show that the defendant was personally involved in the alleged discrimination. See id.

A successful claim of a hostile work environment requires evidence that "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Littlejohn, 795 F.3d at 320-21 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).[9] A hostile work environment claim requires both a subjective and objective analysis; "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that

---

[9] The United States Supreme Court recently clarified the legal standard for an "adverse employment action" under Title VII, holding that a plaintiff need only "show some harm respecting an identifiable term or condition of employment" to sustain a discrimination claim. Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 354-55 (2024). The Second Circuit has not yet ruled on whether this holding affects the requirements for a hostile work environment claim. Because this Court finds that a reasonable juror could find that Plaintiff was subject to a hostile work environment under the "severe and pervasive" standard, which is higher than "some harm," it need not consider whether Muldrow applies here.

20

environment to be abusive." <u>Rivera v. Rochester Genesee Regional Transp. Auth.</u>, 743 F.3d 11, 20 (2d Cir. 2014) (citation omitted).  Accordingly, summary judgment on a hostile work environment claim is inappropriate if "a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions[.]" <u>Banks</u>, 81 F.4th at 262 (quoting <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 360 (2d Cir. 2001)).

The Second Circuit uses a "totality of the circumstances approach to evaluate whether an environment is hostile and abusive[.]" <u>Id.</u>  These circumstances include, but are not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 23).

A totality of the circumstances analysis "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81-82 (1998)) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").  When the offense of a particular word is at issue, courts should pay attention to the "speaker's meaning," which "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 456 (2006).

### i.    Severe And Pervasive Conduct

The frequency of an employer's offensive conduct may be important to a court's hostile work environment analysis.  As to the usual application of a hostile work environment test, to meet the "pervasive" requirement of "severe and pervasive," the complained-of conduct must be

"sufficiently continuous and concerted" and "more than episodic."  Littlejohn, 795 F.3d at 321 (citations omitted).  The incidents must "occur either in concert or with a regularity that can reasonably be deemed pervasive."  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 724 (2d Cir. 2010) (citations omitted).  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002). When an alleged hostile work environment is based on offensive and derogatory language, courts generally look for a "barrage of opprobrious racial comments," rather than "sporadic racial slurs[.]"  Schwapp, 118 F.3d at 110 (citations omitted); see Fincher, 604 F.3d at 724 (a plaintiff typically "must show more than a few isolated incidents of racial enmity").

Nevertheless, the general rule that a single act of harassment does not constitute a hostile work environment is not absolute.  In certain circumstances, "even a single act can meet the threshold" a hostile work environment "if, by itself, it can and does work a transformation of the plaintiff's workplace."  Alfano, 294 F.3d at 374.  Evidence of physical threats is material to a court's severity and pervasiveness analysis.  See Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 85 (2d Cir. 2009); Rivera, 743 F.3d at 24 ("The use of racially offensive language is particularly likely to create a hostile work environment when . . . it is presented in a physically threatening manner." (citation & quotation marks omitted)).

For example, in Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2000), the Second Circuit reversed an order granting summary judgment because, although the plaintiff was subject to "only one occasion" of sex-based comments, they came "at length," "loudly," and "in a large group in which [the plaintiff] was the only female and many of the men were her subordinates." Id. at 154.  Specifically, the plaintiff was told "shut the f**k up, you f**king whining c**t" and subjected to "inappropriate remarks concerning [the plaintiff's] menstrual cycle" and an

accusation "that [the plaintiff] had gained her office . . . only by performing fellatio." Id. at 148, 154. More recently, in Banks v. General Motors, LLC, 81 F.4th 242 (2d Cir. 2023), the Second Circuit found that reasonable juror could find a hostile work environment based on a single incident in which a manager in the plaintiff's workplace "walked into her office with another colleague, began yelling at her, and shook a thick, rolled-up document threateningly in her face." Id. at 253, 264. The manager's tirade could be heard "up to 50 feet away," and "one colleague was so concerned that he was prepared to step in to physically protect [the plaintiff] from [the manager]." Id. at 253. The Second Circuit found this single incident to be sufficiently severe because "the incident involv[ed] a perceived physical threat" and "directly challenged [the plaintiff's] authority to fulfill her supervisory duties." Id. at 264.

The Second Circuit has not definitively ruled on whether a single instance of word "n****r" said from a supervisor to a subordinate rises to the level of a hostile work environment, but it has not foreclosed the possibility. See Albert-Roberts v. GGG Const., LLC, 542 F. App'x 62, 64 (2d Cir. 2013) (summary order) (finding that there "may well exist circumstances where a single use of the word 'n****r' would rise to the level of a hostile work environment"); Rivera, 743 F.3d at 24 (noting that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n****r' by a supervisor in the presence of his subordinates" (internal brackets & citations omitted)); Daniel v. T&M Protection Resources, LLC, 689 F. App'x 1, 2 (2d Cir. 2017) (summary order) (declining "to confront the issue of whether the one-time use of the slur 'n****r' by a supervisor to a subordinate can, by itself, support a claim for a hostile work environment"). Notwithstanding this open question, without the right circumstances behind a

23

case, "the standard articulated in Schwapp v. Town of Avon still applies[.]"  Miller v. New York State Police, No. 20-3976, 2022 WL 1133010, at *2 (2d Cir. Apr. 18, 2022) (summary order).

The use of a racially charged slur by a supervisor, directed at a subordinate, supports the Court's analysis on the hostile work environment claim here.[10]  At least one court has found that even a single instance in which a supervisor has called their subordinate a "n****r," can be "sufficient to create a hostile work environment."  Lovejoy v. Gure-Perez, 10 Civ. 5748, 2014 WL 2459656, at *5 (E.D.N.Y. May 21, 2014).  Other district courts within the Second Circuit have declined to dismiss or grant summary judgment on cases based on even limited occurrences of the slur, recognizing its "particularly odious and offensive" context.  Drouillard v. Sprint/United Mgmt. Co., 375 F. Supp. 3d 245, 262 (E.D.N.Y. 2019) (citation omitted); see Spencer v. Glob. Innovative Grp., LLC, 17 Civ. 7604 (PGG) (BCM), 2023 WL 6633860, at *11-12 (S.D.N.Y. Oct. 12, 2023) (noting that "a supervisor's use of the n-word has a far greater impact on an employee's work environment than a co-worker's use of that slur" and "[t]he fact that black employees also may have spoken the term 'n****r' does not mitigate the harm caused by [a supervisor's] use of that epithet" (quoting Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)).

---

[10] District courts in within the Second Circuit have held that a one-time use of the slur, said between co-workers, on its own does not meet the severe-or-pervasive standard required for a hostile work environment.  See Blue v. City of Hartford, 3:18 Civ. 974 (CSH), 2019 WL 7882565, at *1, 9 (D. Conn. Oct. 22, 2019); Johnson v. City of New York, 17 Civ. 7585 (PKC) (RER), 2019 WL 4468442, at *7 (E.D.N.Y. Sep. 18, 2019); Boakye-Yiadom v. Laria, 09 Civ. 622 (DRH) (ARL), 2012 WL 5866186, at *10, 10 n.12 (E.D.N.Y. Nov. 19, 2012); Diagne v. New York Life Ins. Co., No. 09 Civ. 5157 (GBD) (GWG), 2010 WL 5625829, at *2-3 (S.D.N.Y. Dec. 8, 2010), report & recommendation adopted, 2011 WL 204905 (S.D.N.Y. Jan. 21, 2011), aff'd, 472 F. App'x 56 (2d Cir. 2012) (summary order).

ii.        **Conduct Attributable To A Protected Class**

A finding of severe and pervasive conduct does not end the court's hostile work environment inquiry.  In order to constitute a hostile work environment, it is "axiomatic" that the employer's acts occur because of the employee's protected characteristic.  See Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).  A hostile work environment can be created because of an employee's protected class when the employee is subjected to racial or ethnic slurs.  See, e.g., Rivera, 743 F.3d at 24; Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) ("The use of a racist epithet is certainly evidence of racial discrimination.").  Invocations of a period of persecution against a minority group can also create a race-based hostile work environment.  See Banks, 81 F.4th at 265 (citations & quotation marks omitted) (noting that the image of a noose, like a reference to slavery, is "deeply a part of this country's collective consciousness and history," from which a "racial motive" can be inferred).

An inference against discrimination exists if the individual engaging in allegedly discriminatory conduct is a "member of the same protected class as [the] plaintiff[.]"  Meyer v. McDonald, 241 F. Supp. 3d 379, 390-91 (E.D.N.Y. 2017).  Although not dispositive, this inference "creates an additional hurdle that [the] plaintiff must overcome."  Id. at 391.  This inference does not mean that "where the plaintiff and decisionmaker are in the same protected class, there can never be discrimination; rather, there must be 'additional evidence' of discrimination" for the plaintiff's claim to succeed.  Brown v. City Univ. of New York, 21 Civ. 854 (PKC) (MMH) 2022 WL 4637818, at *13, 20 (E.D.N.Y. Sep. 30, 2022) (dismissing a hostile work environment claim in part because the plaintiff did not allege that she was subject to "slurs, derogatory comments, harassment, or any gender or racial-stereotypes").

25

b.      NYCHRL

Discrimination claims under the NYCHRL "must be reviewed independently from and 'more liberally' than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted).  Therefore, even if the conduct at issue in a discrimination claim is not "actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).

Under the NYCHRL, the plaintiff "need not allege 'either materially adverse employment actions or severe and pervasive conduct.'" Bautista v. PR Gramercy Square Condominium, 642 F. Supp. 3d 411, 427 (S.D.N.Y. 2022) (quoting Mihalik, 715 F.3d at 114)).  Instead, it is enough for the plaintiff to "put forward evidence of 'unequal treatment based upon membership in a protected class.'" Nieblas-Love v. New York City Housing Auth., 165 F. Supp. 3d 51, 68 (S.D.N.Y. 2016) (quoting Fattoruso v. Hilton Grand Vacations Co., 873 F. Supp. 2d 569, 579 (S.D.N.Y. 2012)).

Even with an emphasis on differential treatment, a discrimination claim under the NYCHRL claim does not fail if there are no comparators.  The 2005 amendments to the NYCHRL intended the City law to act as a "one-way ratchet," treating "similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall." Loeffler, 52 F.3d at 278 (citation omitted) (emphasis in original).  As such, if a hostile work environment claim under Section 1981 survives summary judgment, the corresponding NYCHRL claim survives as well.  See Pardovani v. Crown Building Maintenance Co., 15 Civ. 9065 (JPO), 2020 WL 2555280, at *5 (S.D.N.Y. May 20, 2020).

2.      **Application**

a.      **Section 1981**

Plaintiff testified that the December 23, 2022, incident was the only time where anyone at Scorch made a comment about Plaintiff's race.[11]  See Hechavarria Dep. 174:14-175:2.  As Plaintiff concedes that he was subject to a hostile work environment because of his membership in a protected class on only one occasion, this Court will analyze Plaintiff's hostile work environment based on the December 23, 2022, incident and its aftermath alone.

i.      **The Severity Of Mr. Young's Conduct**

In this case, in order to survive summary judgment, Plaintiff must show, subjectively and objectively, that this single event was "very serious."  Alfano, 294 F.3d at 374.  Plaintiff meets the subjectivity requirement for a hostile work environment.  At his deposition, Plaintiff testified that after the December 23, 2022, incident, he felt "dead," "like a piece of s**t," and "like [Mr. Young] literally robbed me from what we supposed [sic] to be standing for."  Hechavarria Dep. 154:22-25.  Plaintiff also testified that Mr. Young "really messed [him] up mentally," and that Plaintiff could not get Mr. Young's words out of his head.  Id. 226:3-10.  ("I hear the E-R all the g*****n time when anybody says it now.  That's how much he pushed it out.").  Following the incident, Plaintiff testified that he didn't "even want to be black no more[.]"  Id. 156:10-11.  Even though Plaintiff did not work at Scorch after the December 23, 2022, incident, and the restaurant closed permanently a few months later, see Pl.'s Rule 56.1 Statement ¶¶ 96-97, the emotional toll of the event lingered.  See id. 224:20-225:4.  This Court finds that Plaintiff proved

---

[11] Although Plaintiff testified as to multiple instances in which he found Mr. Young's conduct "evil," see Pl.'s Rule 56.1 Statement ¶ 22, this Court will not factor these events into its hostile work environment analysis because Plaintiff does not connect these events to any protected class or activity.

that he "subjectively perceive[d] that environment [at Scorch] to be abusive," <u>Rivera</u>, 743 F.3d at 20, as well as "very serious." <u>Alfano</u>, 294 F.3d at 374.

Defendants' summary judgment motion turns on whether a rational juror could find that Plaintiff's belief was reasonable. <u>See</u> <u>Banks</u>, 81 F.4th at 262. Viewing the evidence in the light most favorable to the non-moving party, this Court finds that Plaintiff also satisfies this objective standard.

There are significant disputes as to the full sequence of events on December 23, 2022. It is not in dispute that Mr. Young and Plaintiff got into a verbal altercation, during which Mr. Young called Plaintiff "incompetent," and a "b***h-a** n****" (although the parties dispute the tone and pronunciation of the word), and said to Plaintiff, "f**k your human rights." Pl.'s Ex. 1. Everything else is hotly contested. If a jury were to believe Defendants' version of the events, Mr. Young maintained his composure while Plaintiff became increasingly aggressive and pushed Mr. Young, and Mr. Young did not call Plaintiff any names other than the ones caught on video. <u>See</u> Young Dep. 79:9-25, 84:19-85:5, 91:7-23, 122:12-16. Under this narrative, Mr. Young only called Plaintiff names when Plaintiff refused to leave Scorch, after being told to do so. <u>See</u> <u>id.</u> 85:4-86:3. Mr. Young never told Plaintiff to come back to work after this altercation. <u>See</u> <u>id.</u> 80:18-21.

But, if a jury were to believe Plaintiff, they would find that Mr. Young was "belligerent" and physically threatening towards Plaintiff, and that he tried to engage Plaintiff in a physical fight. Hechavarria Dep. 77:10-13, 110:19-23, 128:24-25. A jury could also find that Mr. Young, after fighting with Plaintiff in the kitchen, followed Plaintiff down into the basement and continued the altercation while Plaintiff was gathering his belongings to leave the premises, as advised by Mr. Golightly. <u>See</u> Hechavarria Dep. 181:2-8. Throughout this altercation, Mr.

28

Young repeatedly called Plaintiff a "hood booger," a "slave," and a "n****r," and said "f**k your human rights" in two separate locations loudly enough for customers to hear in one of them. Id. 110:19-23; Golightly Aff. ¶ 24. These drastically different alleged facts are material to Plaintiff's hostile work environment claim.

In support of their argument for summary judgment, Defendants cite three cases in which the court dismissed a plaintiff's hostile work environment claims, based the word "n****r" in the workplace. These cases are all distinguishable. Both Blue v. City of Hartford and Boakye-Yiadom v. Laria involved instances in which the plaintiff was subjected to the racially offensive slur by a co-worker, not a supervisor. See Blue, 2019 WL 7882565, at *1; Boakye-Yiadom, 2012 WL 5866186, at 10. Although the objectionable conduct in Miller came from a supervisor, none of the racial slurs or other offensive statements was directed at the plaintiff, but rather were said to other people in the plaintiff's presence. See Miller, 2022 WL 1133010, at *2. The only conduct in Miller directed at the plaintiff involved the defendant showing the plaintiff an internet video "making fun of an African American woman[.]" Id. Defendants have not cited any authority in which the court evaluated a hostile work environment claim when a supervisor directed the racial slurs at a subordinate.

Plaintiff, however, has. In Lovejoy v. Gure-Perez, the Eastern District of New York found that the plaintiff endured a hostile work environment when "she was called 'n****r' by her supervisor in an aggressive and intimating tone, with saliva falling onto her body, and loudly enough for others to hear it." Lovejoy, 2014 WL 2459656, at *5. Accepting Plaintiff's testimony, these same events all happened to him.

Defendants' attempts to distinguish Lovejoy are not persuasive. Defendants correctly note that in Lovejoy, the plaintiff was subject to more than one incident of racial animus. See

29

ECF No. 27 at 7; <u>Lovejoy</u>, 2014 WL 2459656, at *4-5.  These other instances of racist behavior do not successfully differentiate <u>Lovejoy</u> from this case because the court in <u>Lovejoy</u> stated that "[e]ven if plaintiff established that being called 'n****r' <u>was the only incident</u> of racial animus, <u>this would suffice</u> for a hostile work environment claim." <u>Id.</u> at *5 (emphasis added).  Moreover, Plaintiff's allegations involve multiple offensive remarks to Plaintiff and physically threatening conduct in two locations, despite a friend's efforts to diffuse the situation.

Defendants correctly point out that the Second Circuit has not yet found a case where a one-time use of the word "n****r," said from a supervisor to a subordinate, sufficiently created a hostile work environment.  <u>See</u> Defs.' Mot. Summ. J. 8; <u>Albert-Roberts</u>, 542 F. App'x at 64 (summary order); <u>Daniel</u>, 689 F. App'x at 2 (summary order).  But, viewing the evidence in the light most favorable to the non-moving party, this is not a case where the defendant just said a racial slur one time to the plaintiff.  This is a case in which, accepting Plaintiff's testimony (albeit, sometimes conflicting) as true, Mr. Young physically threatened Plaintiff in two areas of the restaurant and subjected him to a steady stream of insults, including references to slavery, statements that Plaintiff had no rights, and "probably the most offensive word in English." <u>Banks</u>, 81 F.4th at 266 (quoting <u>Woods v. Cantrell</u>, 29 F.4th 284, 285 (5th Cir. 2022)).  In addition, Mr. Young spoke so loudly that spit was "flying on [Plaintiff's] face," and customers could hear the exchange from the restaurant's kitchen.  Hechavarria Dep. 155:9-11; Golightly Aff. ¶ 24; Pl.'s Rule 56.1 Statement ¶ 48.  Mr. Young continued this tirade even when Plaintiff made a reference to the New York State Division of Human Rights.  <u>See</u> Hechavarria Dep. 111:19:25.  Under the totality of the circumstances, the December 23, 2022, incident closely resembles other cases in which the Second Circuit found a hostile work environment based on a single event.  <u>See</u> <u>Howley</u>, 217 F.3d at 154; <u>Banks</u>, 81 F.4th at 253, 264.

ii.    **The Connection Between Mr. Young's Conduct And Plaintiff's Race**

Defendants also argue that Plaintiff's hostile work environment claim fails because Mr. Young's outburst toward Plaintiff was due to personal animosity, not Plaintiff's race.  See Defs.' Mot. Summ. J. 11.  Defendants may have correctly characterized this incident, but this Court must accept Plaintiff's testimony for the purposes of this motion, and that testimony suggests racial animosity.

Defendants' argument is also unpersuasive because earlier in their motion papers, Defendants characterized the December 23, 2022, altercation as an "isolated incident of racial enmity."  Id. 9 (internal brackets omitted) (quoting Schwapp, 113 F.3d at 110).  Elsewhere, Defendants argue that "none of the additional examples Plaintiff offers of Defendant Young's purported conduct can be said to be actions taken 'because of' Plaintiff's race."  Id. 7 (emphasis added).  Defendants' argument that Mr. Young's conduct is not attributable to Plaintiff's race does not even emerge until Defendants' NYCHRL arguments, even though, as Defendants point out, this causation requirement applies to claims under Section 1981 as well.  See Defs.' Mot. Summ. J. 5, 7, 10.  Given the standard for this motion, Defendants failed to connect Section 1981's causation requirement to the December 23, 2022, incident, and Defendants' characterization of this incident as one of "racial enmity," id. 9, this Court rejects Defendants' argument.

Even if Defendants had not conceded the requirement of race-based conduct, this Court finds that a reasonable juror could connect the December 23, 2022, incident to Plaintiff's race.  It is undisputed that Mr. Young called Plaintiff the "N-word."  See Young Dep. 84:16-18.  This word is an "unambiguously racial epithet."  Banks, 81 F.4th at 266.

31

Plaintiff acknowledges in his motion papers that the word can have different levels of offense and insult depending on the social context.  See Pl.'s Opp. Mot. 8.  That complex social history of the word is evident in the record.  Mr. Young testified that employees at Scorch used "the n-word" so "frequently that, when we use it, there's not a negative meaning behind it.  It's just like – we're just using it in our language."  Young Dep. 146:10-14, 147:4-7; see Moore Dep. 68:18-25.  According to Mr. Young, Plaintiff himself used the N-word at Scorch in a non-derogatory manner.  See Young Dep. 146:12-17.  Determining whether Mr. Young meant the use of the "N-word" as a racial insult on December 23, 2022, requires an analysis into the word's "context, inflection, tone of voice, local custom, and historical usage."  Ash, 546 U.S. at 456.

These contextual clues are all disputed in this litigation.  The parties even dispute whether Mr. Young called Plaintiff a "n****r" or "n***a."  See Pl.'s Rule 56.1 Statement ¶ 53.  These disputes create a genuine issue of material fact as to whether Mr. Young's conduct was because of Plaintiff's race, and whether Mr. Young's intent was to discriminate.  Even though only four seconds of the exchange between Plaintiff and Mr. Young are caught on video, see Pl.'s Ex. 1, the details of the remainder of the altercation are only elicited through conflicting testimony.  Whether the December 23, 2022, incident is a "case of one black person using the word 'n*gga' with another black person in casual conversation or as a term of endearment" is a question for a jury.  Pl.'s Opp. Mot. 8.

Even though Mr. Young, Plaintiff and every other former Scorch employee are members of the same protected class, contrary to Defendant's argument, see Defs.' Mot. Summ. J. 10, a reasonable juror may still find that Plaintiff was subject to a hostile work environment based on his race.  A nearly identical outcome has happened before.  In Johnson v. Strive East Harlem Emp. Grp., 990 F. Supp. 2d 435 (S.D.N.Y. 2014), the plaintiff filed, inter alia, a hostile work

environment claim after her supervisor told her she and a co-worker "acted like n****rs all the time." 990 F. Supp. 2d at 442. After a trial, the jury reached a verdict for the plaintiff, even though the plaintiff's supervisor "self-identifi[ed] as a black man of Latino descent" and claimed that he was not using the word in a derogatory manner. Mem. of Law. in Supp. of Defs.' Post-Trial Mots. at 1, 13, Johnson v. Strive East Harlem Emp. Grp., 990 F. Supp. 2d 435 (S.D.N.Y. 2014) (No. 12 Civ. 4460 (HB) (MHD)), 2013 WL 12317520. The District Court denied the defendants' motion for a new trial on the hostile work environment claim, that under "no circumstances . . . would calling a subordinate a n****r be acceptable conduct." Johnson, 990 F. Supp. 2d at 446, 449. Given that Mr. Young is Plaintiff's supervisor, a jury may reach a similar outcome in this case as in Johnson.

Even without Johnson as a prior example, Plaintiff has put forth evidence on the record sufficient to survive an inference against discrimination. Plaintiff testified that Mr. Young called him a "slave" on December 23, 2022, and said that he had "no human rights." Hechavarria Dep. 111:14-17. In the light most favorable to the non-moving party, Mr. Young, Plaintiff's superior at work, referenced a period of history in which African Americans were denied the legal and social recognition of their human rights, all while saying that Plaintiff himself did not have such rights. A reasonable juror could draw a connection between these statements and Plaintiff's race. As such, whether Mr. Young called Plaintiff a "slave" with "no human rights," and what his intent was as to any of his remarks, are genuine issues of material fact.

This Court notes that a hostile work environment in this case likely only exists if a jury accepts Plaintiff's testimony and rejects Defendants' representation of the December 23, 2022, incident. Resolving the competing narratives in the record requires scrutiny of the parties' credibility, which this Court may not do on a summary judgment motion. See Barrows, 36 F.4th

at 54.  Given that, if credited, Plaintiff's testimony "would lead to a different legal outcome" in this case, summary judgment on Plaintiff's hostile work environment claim under Section 1981 should be denied.  Krynski, 707 F. Supp. 2d at 322

### b.    NYCHRL

Defendants argue that Plaintiff was not subject to a hostile work environment under the NYCHRL because, since every employee at Scorch was African American, Plaintiff cannot prove that he was treated "less well" than other employees outside of his protected class.  Defs.' Mot. Summ. J. 10.  This argument mischaracterizes the law.  The NYCHRL does not specifically require a plaintiff to show that he was treated less well than other employees who were outside of the plaintiff's protected class.  See Mihalik, 715 F.3d at 110.  Rather, a plaintiff must only show that he was treated less well than other employees "because of" his membership in a protected class.  Id. (citations omitted).  In other words, there must still be a causal nexus between the employer's conduct and the employee's race.  This Court has already found, in its Section 1981 analysis, that a reasonable juror may find such a nexus.  This finding applies equally to the NYCHRL.

The NYCHRL's relationship to federal law is also fatal to Defendants' argument.  Because the NYCHRL treats federal civil rights legislation as a "floor below which the City's Human Rights law cannot fall," Loeffler, 52 F.3d at 278 (emphasis removed), if a federal discrimination claim survives summary judgment, then the NYCHRL claim survives as well.  See Pardovani, 2020 WL 2555280, at *5.  This Court has already found that genuine issues of material fact preclude summary judgment on Plaintiff's Section 1981 hostile work environment claims.  These same issues of material fact also defeat summary judgment on Plaintiff's NYCHRL claims.

### B.    Plaintiff's Retaliation Claims Against Defendants

In their motion for summary judgment, Defendants argue Plaintiff's retaliation claims fail because 1) Plaintiff cannot establish a prima facie claim of retaliation; and 2) Defendants terminated Plaintiff's employment for legitimate, non-retaliatory business reasons, namely Plaintiff's performance issues and Scorch's financial troubles.  See Defs.' Mot. Summ. J. 11-19. Plaintiff argues that he suffered retaliation when he protested Mr. Young's treatment of him on December 23, 2022, and that Defendants' proffered reasons for Plaintiff's termination are pretextual.  See Pl.'s Opp. Mot. 10-21.

As with Plaintiff's discrimination claims, this Court will first analyze Plaintiff's retaliation claims under Section 1981, then under the NYCHRL.  For the reasons stated below, this Court respectfully recommends that summary judgment be denied as to Plaintiff's retaliation claims.

### 1.    Legal Standard

Both Section 1981 and the NYCHRL prohibit retaliation for making complaints about race discrimination.  "Although the statute is silent on the issue, workplace retaliation is actionable under § 1981."  Amaya v. Ballyshear LLC, 295 F. Supp. 3d 204, 226 (E.D.N.Y. 2018); see CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008) (holding that "42 U.S.C. § 1981 encompasses claims of retaliation").  Under the NYCHRL, it is an "unlawful discriminatory practice" for an employer to "retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter[.]"  N.Y.C. Admin. Code. § 8-107(7).  Defendants move for summary judgment on Plaintiff's retaliation claims under both Section 1981 and the NYCHRL.

35

###### a.    Section 1981

Retaliation claims under Section 1981 adhere to the same legal standard as retaliation claims under Title VII.   See Banks, 81 F.4th at 275.  For both statutes, a court's retaliation analysis follows the burden-shifting evidentiary framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Carr v. New York City Transit Auth., 76 F.4th 172, 178 (2d Cir. 2023); Littlejohn, 795 F.3d at 315.   According to the McDonnell Douglas framework, the plaintiff bears the initial burden to prove a prima facie case of retaliation.  See Fincher, 604 F.3d at 720.  "If the plaintiff succeeds, then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action the plaintiff alleges was retaliatory." Id.  If the employer meets this burden, then "the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." Carr, 76 F.4th at 178 (quoting Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70 (2d Cir. 2015)).  Although a plaintiff must ultimately demonstrate that "the retaliation was a but-for cause of the employer's adverse action," Banks, 81 F.4th at 275 (internal citations & quotation marks omitted), retaliation need not be the employer's only motive; it is possible for a defendant to have multiple but-for causes for its actions.  See id. (citing Bostock v. Clayton Cnty., Georgia, 590 U.S. 644, 656 (2020)).

###### i.    Prima Facie Case Of Retaliation

In order to establish a prima facie cause of retaliation, a plaintiff must show that 1) he engaged in protected activity; 2) the employer knew of this protected activity; 3) the plaintiff suffered an adverse employment action; and 4) a "causal connection exists between the protected activity and the adverse employment action[.]" Fincher, 604 F.3d at 720 (citations omitted). The burden to prove a prima facie retaliation case is "de minimis."  United States v. New York

36

City Dep't of Educ., 407 F. Supp. 3d 365, 402 (S.D.N.Y. 2018).  It is also a "burden of production, not persuasion, and involves no credibility assessments."  Id. (quoting Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 375 (E.D.N.Y. 2013)).

Protected activity under Title VII and Section 1981 encompasses a wide variety of acts. In addition to filing formal complaints, protected activity also includes "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges."  Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).  Protected activity also occurs "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination[.]"  Littlejohn, 795 F.3d at 317 (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276 (2009)) (brackets & ellipsis in original).

A plaintiff alleging retaliation also enjoys a low bar to establish a defendant's knowledge of protected activity.  At the prima facie stage, corporate knowledge is sufficient to establish a corporate defendant's knowledge of protected activity.  See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013).  Making a complaint with a corporate officer satisfies this corporate knowledge requirement.  See id.  Knowledge of the activity itself is insufficient; to satisfy the second prima facie prong, the employer must "reasonably have understood" that the "opposition was directed at" unlawful and discriminatory conduct.  Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 15 (2d Cir. 2013) (citation omitted).

For retaliation purposes, an employment action becomes adverse when the conduct at issue "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)

(citations & quotation marks omitted).  Termination of employment is considered an adverse employment action.  See, e.g., Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015) (citation omitted); Moore v. Hadestown Broadway L.L.C., 722 F. Supp. 3d 229, 254 (S.D.N.Y. 2024).

As to the fourth prima facie prong, a plaintiff may demonstrate a causal connection either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (quoting Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  Although there is no definitive point where temporal proximity between protected activity and an adverse action gives rise to a retaliatory inference, the passage of mere days is "sufficient to plausibly support an indirect inference of causation."  Littlejohn, 795 F.3d at 319-20.

An inference of retaliation based on temporal proximity fails if an employer was "contemplating" its adverse action before learning of a plaintiff's protected activity.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [adverse actions] upon discovering that a . . . suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").  Generally, a prima facie case of retaliatory discharge does not exist if the employer made their decision to terminate before the employee's complaint of unlawful activity.  See Warmin v. New York City Dep't of Educ., 16 Civ. 8044 (KPF), 2021 WL 517777, at *9 (S.D.N.Y. Feb. 11, 2021); Irons v. Bedford-Stuyvesant Comm. Legal Servs., 13

Civ. 4467 (MKB), 2015 WL 5692860, at *26 (E.D.N.Y. Sep. 28, 2015) (collecting cases); Redd v. New York State Div. of Parole, 923 F. Supp. 2d 371, 389 (E.D.N.Y. 2012).

Because the question of retaliation turns on the timing of a defendant's decision, it is immaterial whether a plaintiff received notice of the termination prior to the protected activity. See Forrest v. New York City Housing Auth., 22 Civ. 06480 (JLR), 2023 WL 3203646, at *10 (S.D.N.Y. May 2, 2023) (noting that "if Defendants had already decided to terminate Plaintiff's employment before the protected activity," then "the protected activity could not have been the cause of the adverse employment action of termination regardless of when Plaintiff was notified of the decision"); Warmin, 2021 WL 517777, at *9.

### ii.     The Employer's Non-retaliatory Reasons For Its Actions

If an employee demonstrates a prima facie case of retaliation, the burden shifts to the employer to show a "legitimate, non-retaliatory reason for the adverse employment action." Ya-Chen Chen, 805 F.3d at 70 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). This burden is not high; the court's analysis is restricted to the employer's stated motivations, not whether these motivations are true. See Claud v. Brown Harris Stevens of Hamptons, LLC, 676 F. Supp. 3d 100, 129 (E.D.N.Y. 2023) (noting that "the employer's explanation of its reasons must be clear and specific" (citation omitted)). An employee's "poor work performance" and "bad behavior" are both examples of legitimate, non-retaliatory reasons for an employer's adverse action. See Zann Kwan, 737 F.3d at 845.

### iii.     Pretext

At the pretext stage, a court must evaluate whether an employer's "articulated purpose" for the adverse action at issue was the "actual purpose." Claud, 676 F. Supp. 3d at 130 (quoting DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993)) (emphasis in original).

"Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage."
Zann Kwan, 737 F.3d at 847.  In order to prove pretext, a plaintiff must "offer more than self-
serving and conclusory allegations that the defendants' proffered reasons [for the adverse
employment action] were false."  Hartley v. Rubio, 785 F. Supp. 2d 165, 180 (S.D.N.Y. 2011).
A plaintiff may instead "prove that retaliation was a but-for cause of an adverse employment
action by demonstrating weaknesses, implausibilties, inconsistencies, or contradictions in the
employer's proffered legitimate, [non-retaliatory] reasons for its action."  Zann Kwan, 737 F.3d
at 846 (finding a triable issue of fact as to retaliation when the employer's evidence contradicted
itself multiple times as to its reasons for the plaintiff's termination).

Although a court should evaluate whether an employer's reason for a termination was
pretextual, the court may not "second-guess the business judgment for a termination[.]"  Bowen-
Hooks v. City of New York, 13 F. Supp. 3d 179, 232 (E.D.N.Y. 2014) (citations & quotation
marks omitted).  It is similarly not the court's place to "evaluate whether a defendant's stated
purpose is unwise or unreasonable."  Claud, 676 F. Supp. 3d at 130 (citation omitted).

   a.    NYCHRL

As with discrimination claims, retaliation claims are construed "more liberally" under the
NYCHRL than under Title VII or Section 1981.  Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639,
661 (E.D.N.Y. 2015) (quoting Loeffler, 582 F.3d at 278).  Nevertheless, the framework to
evaluate these claims, however, does not change.  A court's analysis of retaliation under
NYCHRL begins under the McDonnell Douglas framework.  See id.  Under the NYCHRL, like
with Section 1981, "the plaintiff must first establish a prima facie case, and the defendant then
has the opportunity to offer legitimate reasons for its actions."  Ya-Chen Chen, 805 F.3d at 75-
76.  At the pretext stage, the NYCHRL departs from Title VII and Section 1981: a plaintiff may

survive summary judgment even if "the defendant's stated reasons were not its sole basis for taking action," so long as "its conduct was based was based at least in part on discrimination." Id. at 76 (citations & quotation marks omitted).  In other words, summary judgment under the NYCHRL is only appropriate "if the record establishes as a matter of law that discrimination or retaliation played no role in the defendant's actions."  Id. (internal brackets, citations & quotation marks omitted).

Despite this lower burden for the plaintiff, the NYCHRL is not a rubber stamp for retaliation claims.  A plaintiff still must show that the employer's conduct happened "as a result" of the employee's protected activity.  Mihalik, 715 F.3d at 112.  Just as under Section 1981, therefore, a retaliation claim fails under the NYCHRL if the protected activity occurs after the adverse employment action.  See Forrest, 2023 WL 3203646, at *10.

### 2.    Application

### a.    Section 1981

Under Section 1981, Defendants argue, Plaintiff cannot establish even a prima facie case of retaliation because Plaintiff's allegations of protected activity are inconsistent and because there is no causal connection between Plaintiff's protests of Mr. Young's actions and the loss of his job.  See Defs.' Mot. Summ. J. 12-13, 17-18.  Viewing the record in the light most favorable to the non-moving party, this Court finds that Plaintiff engaged in protected activity, and that he sets forth a plausible causal connection between this activity and Plaintiff's ultimate termination.

### i.    Prima Facie Case Of Retaliation

As a preliminary matter, there is confusion in the record as to which activities Plaintiff claims to be protected.  Plaintiff's motion papers identify three instances of protected activity: 1) Plaintiff uploading his video recording of the December 23, 2022, incident to Instagram, with the

caption, "This is how my boss is treating me;" 2) Plaintiff's telephone conversation with Mr. Young, in which Plaintiff informed Mr. Young that he would contact the New York State Division of Human Rights; and 3) Plaintiff's text message to Mr. Young, asking how Mr. Young could "violate" him and then close the kitchen. Pl.'s Opp. Mot. 13-14. At his deposition, however, Plaintiff testified that the uploaded video to Instagram "was the only incident" of retaliation. Hechavarria Dep. 181:25-182:19. This Court also notes that the record also indicates, through Plaintiff's testimony, that Plaintiff referred to the Division of Human Rights during his altercation with Mr. Young on December 23, 2022, to which Mr. Young responded, "I don't give a f**k." See Hechavarria Dep. 111:19-22.

Viewing all of the evidence in the light most favorable to the non-moving party, this Court finds that Plaintiff has engaged in protected activity. The Second Circuit's broad definition of "protected activity" is not limited to formal protests of employment discrimination. See Sumner, 899 F.2d at 209. A reasonable juror could find that a reference to the New York State Division of Human Rights during a two-part dispute in which multiple racially derogatory remarks were made was a protected activity. See Hechavarria Dep. 111:19-21. Repeating that reference and suggesting that a complaint could be made when speaking with the employer could also be protected activity. See id. 65:25-66:6. A reasonable juror could also find that Plaintiff's public post of the December 23, 2022, video, combined with the caption "this is how my boss is treating me," was an informal protest of a discriminatory practice. See id. 69:13-17, 113:4-9. Even if Plaintiff's Instagram post is not protected activity, communicating to one's employer an intent to complain to the New York State Division of Human Rights is undoubtedly protected. Furthermore, although Defendants express confusion as to "which of the three alleged activities Plaintiff intends to prove was the impetus for Defendant[s'] retaliation," Defendants do not argue

that any of these activities should <u>not</u> be considered protected activity. Defs.' Mot. Summ. J. 13. For these reasons, this Court finds that Plaintiff satisfied the first prong of a <u>prima facie</u> retaliation case.

Plaintiff also satisfies the second and third <u>prima facie</u> retaliation prongs. As Plaintiff points out, Mr. Young had personal knowledge of all four instances of potential protected activity. <u>See</u> Pl.'s Opp. Mot. 14 n.2. Mr. Young was present during the December 23, 2022, altercation, in which Plaintiff made a reference to the Division of Human Rights, implying that he would report Mr. Young's conduct. <u>See</u> Hechavarria Dep. 111:19-22. Mr. Young discussed the Instagram video with Plaintiff during his December 24, 2022, telephone calls with Plaintiff, indicating that he was at least aware of the video. <u>See</u> <u>id.</u> 113:7-16. Plaintiff again told Mr. Young directly that he was thinking about contacting the Division of Human Rights over the telephone, and later sent a text message saying Mr. Young "violate[d]" him directly to Mr. Young. Defs.' Ex. O. Mr. Young therefore knew of all these protected activities, and a jury could find he reasonably understood that they related to the December 23, 2022, incident. Because Mr. Young is the owner of Scorch, his personal knowledge translates to Scorch's general corporate knowledge as well. <u>See</u> <u>Zann Kwan</u>, 737 F.3d at 844. Lastly, the termination of Plaintiff's employment is undoubtedly an adverse employment action. <u>See</u> <u>Vega</u>, 801 F.3d at 85; <u>Moore</u>, 722 F. Supp. 3d at 254.

The fourth <u>prima facie</u> prong presents the greatest hurdle for Plaintiff. In support of Defendants' neutral and non-retaliatory reasons for Plaintiff's termination, Defendants have put forth corroborated testimony on the record that Mr. Young and Mr. Moore decided to terminate Plaintiff's employment following the December 4, 2022, altercation between Plaintiff and Mr. Fortson. Mr. Moore testified that Plaintiff had "gone too far," and that his employment needed

43

to end before "something that would be a lot worse" happened. Moore Dep. 62:19-63:5. Mr. Young testified that the December 4, 2022, altercation was the "straw that kind of broke the [camel's] back," as to Plaintiff's employment. Young Dep. 112:3-8. Plaintiff does not dispute in his opposition to Defendants' statement of undisputed material facts that Mr. Moore decided to terminate Plaintiff's employment on December 8, and that Mr. Young agreed to extend Plaintiff's employment for an additional two weeks. See Pl.'s Rule 56.1 Statement ¶¶ 27, 30. It is unclear from the record whether this admission in Plaintiff's Rule 56.1 statement was intentional or not because it appears inconsistent with Plaintiff's claim that he did not receive a termination letter. See id. ¶ 30; Hechavarria Dep. 66:21-67:4.

The parties dispute whether Plaintiff received Mr. Moore's termination letter, and whether Mr. Moore even drafted the letter prior to the end of Plaintiff's employment. See Moore Dep. 58:25-59:15; Hechavarria Dep. 65:14-21. As noted above, Plaintiff does not concede that the December 8, 2022, firing happened. See Hechavarria Dep. 65:19-67:10, 154:22. These disputes do not create a genuine issue of material fact on Plaintiff's part. If Plaintiff never received the termination letter from Mr. Moore, this would have no bearing on Defendants' purported decision to end his employment prior to engaging in any protected activity. Whether an employee learns of an employer's decision to terminate employment before the protected activity is immaterial to the court's retaliation analysis. See Forrest, 2023 WL 3203646, at *10; Warmin, 2021 WL 517777, at *9. Similarly, the authenticity of the letter is not an issue of material fact. Even if Mr. Young did not draft the termination letter until after this action was filed, this would not alter the dates when Messrs. Young and Moore decided to let Plaintiff go.

Nevertheless, there is a genuine issue of material fact in the record as to whether Defendants actually intended to end Plaintiff's employment on December 24, 2022. Mr. Young

44

testified that the December 23, 2022, incident occurred during Plaintiff's last shift at Scorch.  See Young Dep. 118:8-12.  That shift would end early in the morning on December 24, 2022, in accordance with the revised termination letter, listing December 24 as the last date of employment.  See id.  Plaintiff, however, testified that after the December 23, 2022, altercation, Mr. Young and Mr. Golightly both told Plaintiff, "come back tomorrow."  Hechavarria Dep. 153:22-154:3.  These remarks, if made, could have at least two possible interpretations.  The first is that Plaintiff was to work his final shift, as previously discussed.  The second favors Plaintiff, in that it implies Plaintiff was to continue his employment without a termination date.

Mr. Young denies that he told Plaintiff to come back, saying in his testimony, "I don't know who advised him to come back the next day."  Young Dep. 80:18-19.  Mr. Young also testified that he did not expect Plaintiff to come into work on December 24, 2022, but he could not remember whether Scorch was open for business that day.  See id. 118:13-24.

These testimonies directly contradict one another, and the record does not offer any means to reconcile them.  Depending on whom a jury believes, these testimonies could alter the outcome of this claim.  If a jury were to believe Mr. Young, Plaintiff would have no prima facie retaliation claim; by the time Plaintiff engaged in any protected activity, his employer had decided to terminate his employment and his employment was either already over or in its last hours, with a definite end date.  But if a jury were to find Plaintiff's testimony more credible, Mr. Young had not ended Plaintiff's employment and Mr. Young expected Plaintiff to continue working at Scorch beyond his purported last day at work.  This expectation would have rendered Defendants' decision to fire Plaintiff on December 8, 2022, an empty threat, something consistent with Mr. Young's previous decisions not to go through with firing Plaintiff.

Defendants' prior history of continuing Plaintiff's employment after expressing a desire to fire him supports the interpretation that Plaintiff's time at Scorch may have continued indefinitely, even with Mr. Young and Mr. Moore's testimony that they had already finally decided to let Plaintiff go. Defendants had already extended Plaintiff's last day from December 8 to December 24, so it would not be unreasonable to believe that they did not intend to fire Plaintiff, at least for his poor performance, and that Plaintiff was needed to keep the kitchen open so that alcohol could be sold, especially for New Year's Eve. See Defs.' Ex. K; Pl.'s Rule 56.1 Statement ¶ 88; Hechavarria Dep. 42:17-19. Mr. Young had tried to terminate Plaintiff's employment within the first week of his hire, but ultimately decided to give Plaintiff another chance. See Pl.'s Rule 56.1 Statement ¶ 16. Defendants did not terminate Plaintiff's employment in October 2022 after Mr. Young said, in a text message to Mr. Moore, "[w]e can fire [Plaintiff] tonight." Defs.' Ex. H. When Mr. Young tried to terminate Plaintiff's employment after the December 4, 2022, altercation, he again declined to fire Plaintiff that day, and again gave Plaintiff more time. See Pl.'s Rule 56.1 Statement ¶ 30. On Plaintiff's purported last day at Scorch, Mr. Young sent Plaintiff a text message complimenting his performance, without any mention that Plaintiff's employment was approaching its end. See Pl.'s Ex. 2. A reasonable juror may view this record, together with Mr. Young's purported instruction for Plaintiff to "come back tomorrow" after the December 23, 2022, incident, and infer that Mr. Young had decided to continue Plaintiff's employment yet again. Hechavarria Dep. 153:22-154:3. This same reasonable juror may also conclude that Mr. Young finally said that Plaintiff could no longer come to work at Scorch on December 24 and 28, 2022, only after he engaged in protected activity. See Defs.' Ex. P; Young Dep. 99:5-20; Hechavarria Dep. 65-24:66-6.

Plaintiff argues that Mr. Young's text message to Plaintiff on December 28, 2022, saying that Mr. Young "ha[d] to let [Plaintiff] go at this point" raises an issue of material fact as to the timing of Defendants' decision to terminate Plaintiff's employment.  Defs.' Ex. P; see Pl.'s Opp. Mot. 15.  Although on its own, this text message is not sufficient to create a genuine dispute of material fact, this text message is not without context.  The record is replete with testimony that Messrs. Young and Moore decided to terminate Plaintiff's employment, only to later not follow through with their decision.  This remark supports Plaintiff's interpretation of the "come back tomorrow" comment, implying that Plaintiff's employment was continuing at least past December 24, 2022, and was only terminated for the December 23, 2022, and December 24, 2022, communications.  The first unequivocal message in the record that Plaintiff's employment was terminated came less than a week after Plaintiff mentioned the Division of Human Rights to his supervisor, in an altercation filled with racially charged language.  See Defs.' Ex. P; Hechavarria Dep. 111:19-21.  This sufficiently establishes temporal proximity.  See Littlejohn, 795 F.3d at 319-20.  Viewing Plaintiff's employment termination in the context of the complete history of his employment, a reasonable juror may see evidence of retaliation.

Plaintiff's prima facie case of retaliation depends on a jury believing Plaintiff's testimony, and disbelieving Defendants' version of the events.  This Court cannot parse the contradictory evidence in the record without impermissibly analyzing the parties' credibility. See Barrows, 36 F.4th at 54.  There is a dispute of material fact as to whether Plaintiff had been terminated effective December 24, 2022, on December 8, or whether the December 23 and December 24, 2022, protected activities prompted Plaintiff's employment termination.  Plaintiff may rely on temporal proximity and context to show a causal link to his termination.  As such, Plaintiff has met his minimal prima facie retaliation burden.

47

> ii.      **Defendants' Legitimate Reasons For Plaintiff's Termination**

This Court finds that Defendants have satisfied their burden under the <u>McDonnell Douglas</u> framework.  Defendants have offered evidence to support a non-retaliatory reason for letting Plaintiff go, including the December 4, 2022, incident, Plaintiff's performance throughout his employment, including the December 23, 2022 altercation, and Scorch's poor finances.  <u>See</u> Young Dep. 111:22-112:8, 103:13-16.  Physical altercations with co-workers, poor performance, and financial concerns are legitimate, all non-retaliatory reasons to terminate employment.  The burden therefore shifts to Plaintiff to prove that Defendants' reasons for terminating Plaintiff are pretextual, and that but-for Defendants' retaliation, Plaintiff would not have lost his job.

> iii.      **Plaintiff's Evidence Of Pretext**

Defendants' inconsistencies in the record give rise to an inference that their stated reasons to terminate Plaintiff's employment are pretextual.  Scorch's longstanding, severe financial troubles are evident throughout the record, as are Mr. Young's efforts to eliminate expenses.  <u>See, e.g.</u>, Pl.'s Rule 56.1 Statement ¶¶ 86-90.  Despite Scorch's financial problems, and Mr. Young's efforts to keep costs down, Mr. Young increased Plaintiff's hourly pay in December 2022, while his business was faltering, because Plaintiff had asked for more money.  <u>See</u> Young Dep. 20:5-10.  Moreover, Mr. Young gave Plaintiff a raise and a cash advance the same month where he purportedly decided to fire Plaintiff.  <u>See id.</u> 20:17-21:11.  These facts are incongruous, and a reasonable juror may find them to be self-contradictory.

Plaintiff also offers evidence on the record from after Plaintiff's termination that casts doubt onto Defendant's legitimate, non-retaliatory reasons to let Plaintiff go.  Plaintiff testified that before his employment ended, Plaintiff "was supposed to cook for [Scorch's] big New Year's party."  Hechavarria Dep. 67:6-9.  Messrs. Young and Moore do not mention any New

Year's party in their depositions.  See generally Young Dep.; Moore Dep.  As such, they do not

offer any testimony to refute Plaintiff's assertion.  Viewing the evidence in the light most

favorable to Plaintiff, a reasonable juror could find that Defendants continued to inform Plaintiff

that they expected him to work on December 31, 2022, after Plaintiff's employment at Scorch

was supposedly going to end.

Plaintiff also testified that Scorch "still had" a New Year's party, even after Plaintiff was

let go.  Hechavarria Dep. 42:17-19.  Assuming this testimony to be true, Defendants' decision to

let Plaintiff – Scorch's only cook – go less than a week before an anticipated large party further

throws Defendants' reasons for termination into question.  See Pl.'s Rule 56.1 Statement ¶ 12.

At this point, Defendants were aware of the potential business consequences of not having an

operative kitchen, as they received had advice from their liquor-license attorney that they needed

to keep a kitchen open to serve liquor.  See id. ¶ 88.  These decisions could leave a reasonable

juror to question whether Mr. Young's reasons to terminate Plaintiff's employment were

financial and performance-based, or retaliatory.

While it is true that a court may not question the employer's business judgments, it may

scrutinize the record for evidence of retaliation.  See Bowen-Hooks, 13 F. Supp. 3d at 232.

Evidence of retaliation can be found here.

Beyond simple pretext, there is enough evidence in the record to lead a reasonable juror

to conclude that but-for Plaintiff's protected activity, his employment would not have been

terminated.  Despite numerous difficulties with Plaintiff's performance, a reasonable juror could

find that Defendants never previously terminated his employment.  As this Court previously

observed, Defendants only definitively terminated Plaintiff's employment after the events in

which Plaintiff publicly lamented his treatment at work, sharing an altercation using overtly

racial language, and twice specifically mentioned the New York State Division of Human Rights to Mr. Young.  Defendants argue in their motion for summary judgment that Plaintiff was fired because, inter alia, he "cost an already financially declining business over $1,000 in refunded orders" on December 23, 2022.  See Defs.' Mot. Summ. J. 15.  But in his deposition, when asked why Plaintiff was let go, Mr. Young testified, "[f]or Terry, it was mire, this guy had a fight, he's been fighting with employees . . . and for me, it was the fight and the budget."  Young Dep. 128:3-15.  As this Court already discussed, there is a genuine issue of material fact as to whether Plaintiff's actual last day was December 24, or whether his employment had been continued. Mr. Young's only mention on the record of any events on December 23, 2022, that may have led to Plaintiff's termination came in a text message sent to Plaintiff on December 30, 2022.  See Defs.' Ex. Q.  This text message followed a prior text message sent to Plaintiff that day, saying "You are being release[d] due to budget cuts," after Plaintiff mentioned that he had spoken to an attorney.  Id.  A reasonable juror may infer this text message to be a post hoc justification for a prior retaliatory decision.

Based on the inconsistencies above, and because Defendants have not offered any other explanation as to why Plaintiff's employment ended specifically on December 24, as opposed to any other date, a reasonable juror could find that retaliation was a but-for cause of Defendants' decision to terminate Plaintiff's employment.  This Court is aware that Plaintiff's performance and Scorch's financial troubles may have also been motivating reasons to terminate Plaintiff's employment.  A but-for reason for a decision, however, need not be its only reason.  See Bostock, 590 U.S. at 656.  Although Defendants may have wished to fire Plaintiff at several points in Scorch's history, for various reasons, Defendants kept asking Plaintiff to come back to

work.  A reasonable juror may find that Plaintiff's protected activity finally is what tipped Mr. Young over the edge to end Plaintiff's employment.

Mr. Young's supposedly neutral reactions to Plaintiff's Instagram posts do not defeat Plaintiff's retaliation claim.  When Plaintiff spoke with Mr. Young on December 24, 2022, about the videos Plaintiff posted to Instagram, Plaintiff testified that the video captioned, "this is how my boss is treating me" did not bother Mr. Young.  See Hechavarria Dep. 113:7-16.  The videos Plaintiff posted, however, are not his only instances of protected activity.  As this Court has mentioned, Plaintiff mentioned the Division of Human Rights to Mr. Young at least twice.  See id. 66:2-6, 111:19-21.

Defendants' argument that Mr. Young "encouraged Plaintiff to seek counsel when Plaintiff again claimed that he was being discriminated and retaliated against" is also not persuasive.  Defs.' Mot. Summ. J. 18.  While Mr. Young encouraged Plaintiff in a text message "to seek legal advice as needed," he also said "New York is generally considered an 'employment at will' state," and "[t]he discharged NY employee will usually have little to no legal recourse[.]"  Defs.' Ex. Q.  A reasonable juror may view these text messages as Mr. Young telling Plaintiff that any potential claim of his would lack merit.  Rather than evidence of a lack of retaliatory motive, a reasonable juror may make an inference of intimidation based on these text messages.  This inference would support, not refute, Plaintiff's retaliation claim.

This Court notes that a reasonable juror may also, based on the record, rule in Defendants' favor.  Defendants' decision to terminate Plaintiff on either December 24 or December 28, 2022, may be prompted by Plaintiff's misconduct.  Plaintiff's termination may alternately have occurred prior to these dates.  Plaintiff may have been terminated for budget or performance reasons.  It may be that Plaintiff's employment might have continued only for a few

more days, possibly through the New Year's party, given Scorch's financial circumstances, and the layoffs of other employees.[12]  The present record contains conflicting material facts as to most elements of Plaintiff's retaliation claim.  These conflicting facts cannot be decided in Defendants' favor at the summary judgment stage.

Because there are disputed material facts as to whether retaliation was a but-for cause of Defendants' decision to terminate Plaintiff's employment, Plaintiff's retaliation claim under Section 1981 survives summary judgment.

### b.    NYCHRL

Defendants argue that Plaintiff's retaliation claims under the NYCHRL should be dismissed because Plaintiff cannot show a <u>prima facie</u> case of retaliation, and because Plaintiff "cannot establish . . . that retaliation played a role in his termination."  Defs.' Mot. Summ. J. 17-19.  The NYCHRL, however, construes retaliation claims "more liberally" than federal law does. <u>Dillon</u>, 85 F. Supp. 3d at 661; <u>Loeffler</u>, 582 F.3d at 278.  If a reasonable juror could find in Plaintiff's favor on his Section 1981 retaliation claims, that same juror may find that Plaintiff's NYCHRL retaliation claims prevail as well.

## IV.    CONCLUSION

For the reasons stated above, this Court respectfully recommends that Defendants' motion for summary judgment be denied.

Given that the December 23, 2022, altercation lasted only minutes, Plaintiff's employment with Defendants ended mere days after the incident, and Scorch shut down shortly after Plaintiff's termination, Plaintiff may be limited in the damages he could be awarded, if he

---

[12] As Plaintiff correctly argues, the eventual closure of Scorch goes to Plaintiff's damages, not Defendants' liability.  <u>See</u> Pl.'s Opp. Mot. 21.

were to prevail at trial.  This Court therefore notes that settlement discussions before a neutral third party may be beneficial to all parties.  Should the District Court adopt this report and recommendation, the parties would be strongly encouraged to pursue mediation so as to avoid a trial.  If the parties wish to proceed with Court-annexed mediation, they can request a referral via a joint letter.

## V.    OBJECTIONS

This report and recommendation will be filed electronically.  Any written objections to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any request for an extension of time for filing objections must be directed to the District Judge prior to the expiration of the fourteen-day objection period.  Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.  See Miller v. Brightstar Asia, Ltd., 43 F.4th 112, 120 (2d Cir. 2022).


Dated:  Brooklyn, New York
        February 25, 2025


*Vera M. Scanlon*
_____
    VERA M. SCANLON
United States Magistrate Judge